# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-DP-01094-SCT

*KELVIN DYCUS a/k/a KEVIN DYCUS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/19/1998 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RAYMOND WONG |
| | ROBERT McDUFF |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 04/15/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1.     Kelvin Dycus appeals from the judgment of the Bolivar County Circuit Court convicting him of capital murder  and auto theft and sentencing him to death and five years in the custody of the Mississippi Department of Corrections, respectively.  Finding no reversible  error,  we affirm the convictions and sentences.

## FACTS

¶2.    On September 24, 1996, Kelvin and Jason Dycus moved across the lawn of an old house in Cleveland, Mississippi. They had pantyhose yanked down over their faces and rubber gloves, the kind doctors use, covering their hands. One of the men carried a black .25 caliber automatic pistol, while the other clutched a length of rope. They knocked on the front door of 403 North Bayou, where seventy-six-year-old Mary Pittman lived. She'd been there forty years, long after her husband had passed and all her children moved away. She was tired because she had just got out of the hospital a week earlier after a bout with pneumonia. Her right arm still didn't work so well, because they had to take out most of the muscles in it after an infection from the cancer she'd finally beaten a few years before.

¶3.    When she heard the knocks, Mrs. Pittman opened the door without hesitation, just as she would any other time in the decades she had lived on that street. The black automatic smashed into her face when the door opened, and the two men rushed in the house.

¶4.    She staggered up against the wall, and the men demanded to know where her car keys were. When she did not answer, they cracked the pistol into her head again, and she fell to the ground. The two men kept hitting her, screaming "where are the keys?" Mary Pittman would not tell them. One of the men rolled her onto her stomach and bound her arms up with the length of rope, tying them up behind her back.

¶5.    The two men drug her through the house on her knees. Mrs. Pittman continued to struggle. One of the men picked up a lamp and cracked it down over Mrs. Pittman's head. He did it again and again until the lamp shattered into pieces, and then he hit her with the broken base of the lamp.

¶6.    The men threw her face down on her own bed, arms tied behind her back, still conscious. "I know who you are," she told them, "y'all are the boys from across the street."

¶7.    Kelvin and Jason Dycus, aged seventeen and fifteen respectively pressed Mrs. Pittman face down against the bed and laid a pillow across the back of it, pressed the gun up tight against the pillow, and put a single bullet through the back of her head.  They fired a second shot right through her right arm.

¶8.    They rifled through her purse, turning up twenty bucks in cash, eleven dollars in food stamps, and the keys to Mrs. Pittman's  1986 Chevrolet Caprice.  Kelvin Dycus walked through the  blood of Mary Pittman as he and his brother headed for the front door, leaving one distinct crimson footprint on a page of the *Bolivar Commercial* newspaper.

¶9.    The Dycus brothers got in Mrs. Pittman's car and headed down Highway 61 towards Greenville, about forty miles away.  They spent Mrs. Pittman's  money on gas and cigarettes to fuel the trip.  Then they met up with some friends and quickly sold the .25 automatic, which they had stolen from their brother-in-law, for twenty dollars and a little bag of marijuana.  When they ran out of marijuana and  beer,  they jumped back into Mrs. Pittman's car and headed for the B-Quik convenience store, where they hoped to cash a check they stole from Mrs. Pittman.

¶10.    The B-Quik just happened to be the location Greenville Police Department officers and Bolivar County Sheriff's Department officers were meeting up to hunt for the Dycus brothers.   When the lawmen pulled  into the convenience store's parking lot, Mrs. Pittman car was sitting right there.

¶11.    Kelvin and Jason Dycus were arrested immediately; Kelvin had a pair of pantyhose and some rubber gloves stuffed into the pockets of his pants.  Kelvin was shortly indicted by the Bolivar County Grand Jury on two charges:  Count I, the capital murder of Mrs. Pittman,  and Count II, the felony charge of auto theft.

¶12.    Jason, only fifteen at the time of the crime, quickly cut a deal with prosecutors.  Kelvin was tried and was found guilty on both counts of the indictment on June 8, 1998, and sentenced to death by lethal

3

injection. This is his appeal from those judgments; he argues twenty-five errors in the case sub judice. For the reasons listed below, we find no error, and we affirm his convictions for capital murder and auto theft and his sentences of death and five years in the custody of the Department of Corrections.

## SCOPE OF REVIEW

¶13.    We review with heightened scrutiny any sentence of death and any conviction upon an indictment for capital murder. *See* ***Flowers v. State***, 842 So.2d 531, 539 (Miss. 2003). While we may apply different standards for different questions—for example, a review of the admission of evidence—we always apply a heightened scrutiny. We do not take the sentence of death lightly, and a heightened scrutiny is shown to the cases where it is applied.

## ANALYSIS

### 1. Did the trial court err when it denied Dycus a peremptory challenge against a juror?

¶14.   Dycus alleges that the circuit court erred by failing to replace juror Thomas Arinder with an alternate juror. Dycus claims that he should have been allowed to exercise an unused peremptory challenge to remove Arinder from the jury and have an alternate juror seated in his place.

¶15.    During voir dire the prospective jurors were asked if they had any knowledge of or any relationship with Mrs. Pittman or any of the witnesses to be called for trial. Juror Thomas Arinder did not indicate he knew Mrs. Pittman or any of the witnesses.

¶16.    Yet after the jury had been impaneled but before testimony began, Arinder saw the victim's sister in the courtroom. He realized that he knew her, and he promptly brought this to the attention of the court. The judge quickly brought counsel and the juror back into chambers.

4

¶17.    Arinder related that he had gone to church with Mrs. Pittman's sister for thirteen years, although she did not go very much anymore. Yet they were barely acquaintances, and Arinder could not even recall her name when asked by the judge. Arinder told the judge repeatedly that he could lay any relationship or knowledge of Mrs. Pittman's sister aside and render a reasonable and fair verdict based upon the law.

¶18.    Despite this assurance, Dycus moved to strike the juror, and the the court refused the motion. He court reasoned that in a town like Cleveland, Mississippi, with just under fourteen thousand citizens, it is not unusual for one juror to have had insubstantial contact or a bare acquaintance with a witness. We agree.

¶19.    The right to exercise peremptory challenges is indeed impeded if a prospective juror fails to answer an unambiguous question whose answer would allow counsel to make an informed decision about whether to strike that juror. *See Odom v. State*, 355 So.2d 1381, 1383 (Miss. 1978). For "[t]he failure to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause." *Id*. at 1383.

¶20.    There was no *Odom* failure to respond to a relevant, direct, and unambiguous question in the case sub judice. The question was asked of the jury if they knew Mrs. Pittman or any of the witnesses—and Arinder did not respond, because Mrs. Pittman's sister was not on the witness list. She never testified at trial and was not scheduled to do so. Arinder brought his connection with her to the attention of the court

¶21.    The trial judge was wholly correct in not allowing the strike of a juror who once attended church with the victim's sister and who did not even know her name. The trial court had ample opportunity to observe Arinder's demeanor and responses, and carefully and repeatedly asked him if he could be fair and

5

impartial. We will not substitute our judgment for that of the trial judge, who found that this juror was not prejudicial to Dycus. This issue is without merit.

## 2. Did the trial court err in striking a prospective juror?

¶22. Juror Pamela Lee was a compliance officer at the state's maximum-security penitentiary at Parchman, although she did not have direct contact with inmates. She indicated that being sequestered during the trial would be an undue hardship on her.[1] Most importantly, she was highly ambivalent regarding application of the death penalty. Lee would vacillate between stating that she could apply the law of Mississippi and then stating that she would "prefer . . . life without parole [rather] than the death penalty."

¶23. The State of Mississippi applies capital punishment in certain cases, and the Legislature has crafted intricate rules juries must follow in levying society's greatest punishment. *See* Miss. Code Ann. § 99-19-101 (2000). There is even a special oath for jurors in a capital case, which requires them to "be sworn to 'well and truly try the issue between the state and the prisoner, and a true verdict give *according to the evidence and the law*.'" Miss. Code Ann. § 13-5-73 (emphasis added).

¶24. This is the edict of the state, and a juror must honor its lawful application. If jurors provide inconsistent answers regarding their feelings on the stated law of this state, they may be struck for cause. In *Walker v. State*, 671 So.2d 581, 629 (Miss. 1995), we allowed a juror to be "struck for cause because she repeatedly answered counsel's question with the response that she would return a life sentence or at least 'hope to,'" despite the presence of the death penalty. Such a strike is allowed because there is a compelling state interest in jurors upholding the laws of Mississippi.

---

[1]Rule 10.02 of the Uniform Circuit and County Court Rules states that "[i]n any case where the state seeks to impose the death penalty, the jury shall be sequestered during the entire trial."

¶25. A juror's position on the death penalty must be unmistakably clear, or a trial judge may properly remove them for cause. *See Stevens v. State*, 806 So.2d 1031, 1062 (Miss. 2001); *Foster v. State*, 639 So.2d 1263, 1278 (Miss. 1994); *Pinkney v. State*, 538 So.2d 329, 344 (Miss. 1988), *vacated on other grounds by Pinkney v. Mississippi*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990). Deference must be paid to the trial judge who sees and hears the juror for they are in the best position to determine the credibility of the juror. *Id*. at 1062 (*citing Wainwright v. Witt*, 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985)).

¶26. The trial judge's conclusion that Lee was not unmistakably clear regarding application of the death penalty was sufficient to have her struck for cause, and we will not substitute our judgment for his when he observed her demeanor. This issue has no merit.

### 3. Did the trial court err in not striking two jurors who were allegedly biased in favor of the death penalty?

¶27. During general voir dire, counsel for Dycus asked two jurors, Tarver and Hooker, if they would "automatically vote for the death penalty" if Dycus was convicted of capital murder. Both Tarver and Hooker responded affirmatively. Dycus then moved to strike the jurors for cause, and they were interviewed individually.

¶28. During the individual voir dire, Tarver maintained that she would return a sentence of death only if the decision were based on evidence and the law. Hooker offered similar reasoning that he would obey the court's instructions and his oath as a juror to carefully weigh the facts and evidence.

¶29. Dycus argues that the retention of Tarver and Hooker was disparate treatment towards his defense, since the trial court kept Tarver and Hooker as jurors while it allowed the strike of Lee, who was

7

indecisive about the death penalty. Dycus offers *Caldwell v. State*, 381 So. 2d 591 (Miss. 1980), and *Cook v. State*, 85 Miss. 738, 38 So. 113 (1905), as fuel for his argument of disparate treatment.

¶30.   In *Caldwell* a defendant argued that the state received greater latitude in striking jurors that were similarly situated, which resulted in prejudice to his case. *Caldwell*, 381 So. 2d at 593-94. We agreed, since "[u]pon the peculiar facts of th[at] record . . . the trial judge erred in allowing the state to peremptorily excuse that juror." *Id.* at 594. Yet "[t]he error would have been greatly minimized (if not cured), had [the judge] then allowed the defendant to challenge [the] alternate juror." *Id.* Since the state was granted a latitude not accorded the defendant, "[f]airness require[d] that the defendant be granted another trial." *Id.*

¶31.   The case sub judice is completely different. There was no improper strike of a juror as we saw in *Caldwell*, where an advantage was gained by one side through impropriety. Here the trial judge properly struck Lee because she was not unmistakably clear that she would follow her oath and uphold the laws of Mississippi. In great contrast, Tarver and Hooker were adamant that they would uphold the laws of Mississippi—up to and including the penalty of death for a capital crime.

¶32.   Justly relied upon by *Caldwell*, *Cook* involved a very similar situation—the state was allowed by the trial judge to peremptorily strike a juror, but "just after this ruling . . . when the appellant asked the court the privilege of challenging [a juror] peremptorily, the court refused to allow it." *Cook v. State*, 38 So. at 113. We did not hesitate to say that "[i]t was error to thus discriminate." *Id*.

¶33.   Dycus is simply not in the same situation as Caldwell or Cook. They were refused a strike when the prosecution received one, to their detriment; the strikes were peremptory, and unsupported by facts and law. It is clear from the record that Lee was not struck at the whim of the trial judge, but because she could not uphold the law to the standard we require of juries.

¶34. The trial by jury has always been, and will always be, the pride of our system of law. *See* 3 William Blackstone, *Commentaries on the Laws of England* *379. Juries are "the only anchor yet imagined by man, by which a government can be held to the principles of its constitution." 15 *Papers of Thomas Jefferson* 269 (Julian Boyd, et al., eds. 1958) (Letter to Thomas Paine, July 11, 1789).

¶35. Yet the laws are not served if a jury is filled by persons who cannot, or will not, uphold the law. Dycus was not prejudiced by a jury composed of men and women who swore to uphold the law; he would have been if it had been filled with those who would not obey the law. While he may not agree with their results, he cannot argue that they did not perform their duties to the letter of the law. There is no merit to this issue.

### 4. Did the trial court abuse discretion when it admitted the alleged murder weapon into evidence?

¶36. The relevancy and admissibility of evidence are largely within the discretion of the trial court. *See Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990). Our analysis of that discretion is two-fold: we will only reverse when discretion has been abused and where a substantial right of a party has been affected. *See Mitchell v. State*, 792 So. 2d 192, 217 (Miss. 2001).

¶37. Dycus argues that the trial court abused its discretion in allowing a black .25 caliber automatic pistol into evidence. His argument is three-pronged; first, he submits that the prosecution offered no evidence linking the gun to the murder of Mrs. Pittman, rendering it inadmissible. Secondly, Dycus argues that one expert of the State was not qualified to testify about ballistics. Last, Dycus contends the trial judge impermissibly aided the State by counseling the prosecutors regarding admission of the pistol into evidence.

### a. The identification of the pistol

¶38.  The trial court admitted the pistol after multiple parties identified it.  The first was the owner of the pistol, Grady Blaylock, who had been married to the Dycus brothers' sister, Betty Jo.  Blaylock testified that the pistol looked like the one that was discovered missing from his home the night of Mrs. Pittman's murder.

¶39.  Secondly, the State offered Danny Davis, who testified that Dycus had attempted to sell the weapon to him.  He positively identified that it had been in Kelvin's possession, as did Trudy Ponder—the woman to whom Dycus ultimately sold the pistol.[2]  Investigator Bill Quinton testified that Kelvin Dycus told him the gun used to commit the crime was Blaylock's.  Lastly, Jason Dycus testified that he and his brother stole the gun from Blaylock and sold it to Ponder.

### Grady Blaylock

¶40.  Blaylock was well acquainted with the gun—for it had been stolen from him.  He testified that the day before the murder of Mrs. Pittman the Dycus brothers, who were living with him and their sister temporarily, told him that they wanted to buy his pistol.  He declined after they told him that "they was going to kill someone that night."  Blaylock told the brothers they should not joke about things like that.

¶41.  The next night, after the Dycus brothers had disappeared and after the body of Mrs. Pittman was discovered, Blaylock went across the street to speak with the police tending to the investigation.  He told them he had a pistol but that it was missing, and he showed the police where he normally kept it—in his dresser drawer.  The police had discovered a .25 caliber shell close to Mrs. Pittman's body.

¶42.  After Blaylock testified that the pistol seized from Ponder was in fact the one which she purchased from Kelvin Dycus, the prosecution offered it to the trial court as evidence.  Dycus objected on grounds

---

[2] The pistol was sold to Ponder for $20 in cash and roughly $20 worth of marijuana.

10

that the pistol had not actually been connected to the crime. The trial judge reserved ruling on the admission of the pistol, and informed the prosecution that they might renew their request for admission at a later time.

### Betty Jo Dycus Blaylock

¶43.     Betty Jo took the stand after her ex-husband. She testified that she had overheard Blaylock tell her brothers about the pistol and that he kept it in his dresser drawer. Betty Jo testified that the pistol disappeared the night of Mrs. Pittman's murder, and on cross-examination she stated that the weapon in evidence looked like the pistol that had been kept in her home.

### Danny Davis

¶44.     Danny Davis was an acquaintance of the Dycuses. He testified that they offered to sell him a pistol. The brothers told him the pistol had been used in a murder. At trial, Davis identified the .25 automatic pistol presented to him by the prosecution as either the pistol the Dycuses offered to sell to him or one that looked just like it.

### Trudy Ponder

¶45.     Trudy Pirtle, *nee* Ponder, testified that she purchased a black .25 automatic pistol from the Dycuses for $20 and roughly $20 worth of marijuana. When shown the pistol by the prosecution, she testified that it appeared to look like the same weapon she had bought from the Dycuses.

### Investigator Bill Quinton

¶46.     Investigator Quinton testified that Kelvin Dycus wrote in a statement to police that the weapon used to murder Mrs. Pittman was indeed stolen from Blaylock. After this testimony, the State offered to enter the weapon into evidence again and again the trial court excluded it.

### Dr. Steven Hayne

¶47.   Dr. Hayne was accepted by the trial court as an expert in clinical, anatomical, and forensic pathologies.  Board certified in those fields for over twenty years, he testified that the two bullets removed from the body of Mrs. Pittman were "consistent [with] and indicated on the autopsy report as being .25 caliber projectiles."  Dr. Hayne then identified the alleged weapon as a .25 caliber pistol.  After that identification, the trial court entertained a motion by the prosecution to enter the pistol into evidence.

¶48.   The court announced that "[t]aking together the testimony of Dr. Hayne, in regard to the .25 automatic weapon, and with all the other evidence that has been received," the admission was proper. Dycus objected on the grounds that there was no showing the bullets actually came from that particular pistol.  After the weapon was admitted into evidence Jason testified that the weapon was indeed the pistol he and Kelvin had used to rob and murder Mrs. Pittman, and which Kelvin had later sold to Ponder.

¶49.   There was no abuse of discretion by the trial court in this case.  To the contrary, the trial judge was extremely reluctant about admitting the pistol into evidence—only allowing it after half a dozen witnesses, including the man from whom the gun was stolen and the  woman to whom it was sold, concretely tied the weapon to the murder of Mrs. Pittman.

¶50.   Blaylock showed the Dycus brothers the .25 automatic pistol and where it was kept.  They offered him money for it, which he refused.  The very next day the gun turned up missing, and the neighbor was murdered with a .25 caliber shell lying by her body.  A few hours later there was multiple testimony that the Dycus brothers sold a .25 pistol.  The trial judge did not abuse his discretion in admitting this evidence.


### b. The testimony of Dr. Hayne

¶51.    Dycus asserts that Dr. Hayne, the State's forensic expert, should have been precluded from testifying regarding the weapon because he was not a ballistics expert. The trial court has discretion to determine if an expert witness is qualified to testify, ascertaining if the witness "possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman." *May v. State*, 524 So. 2d 957, 963 (Miss. 1988); *see also* Miss. R. Evid. 702.[3]

¶52.    Dr. Hayne testified that he had performed roughly 11,000 to 12,000 autopsies, of which around 2,500 involved gunshot wounds. Of those autopsies, there were 8,000 to 9,000 total gunshot wounds from various caliber weapons. He then stated that the projectile removed from the body of Mrs. Pittman was consistent with a .25 caliber weapon. Given Dr. Hayne's extensive experience with gunshot wounds and the type of weapon that inflicted them, there was no abuse of discretion by the trial court in allowing him to testify. Dr. Hayne did not testify that the .25 pistol offered into evidence was specifically the weapon which discharged the bullet that killed Mrs. Pittman; rather, he testified that Mrs. Pittman was killed by a .25 caliber weapon, a fact which he concluded before he had any notice of recovery of the alleged murder weapon. Dr. Hayne did testify that the pistol shown to him in court was a .25 caliber pistol. Not once did Dr. Hayne testify to ballistics or that the weapon offered for evidence fired the bullets that killed Mrs. Pittman; indeed, he could not have, since he was not a ballistics expert. He simply testified about his area of expertise: that Mrs. Pittman was killed by a .25 caliber weapon. This issue is without merit.

### c. The trial court's instructions on when to introduce the weapon into evidence

¶53.    Dycus asserts that the trial court improperly assisted the prosecution in admitting the weapon into evidence. In support he offers *West v. State*, 519 So. 2d 418 (Miss. 1988). In that case, there were

---

[3] Our adoption of the ***Daubert*** requirements for expert witnesses is not relevant to this opinion, as Rule 702 in its current form was not adopted until after Dycus's trial.

"thirty . . . instances where the trial judge improperly, or unnecessarily, interjected himself into the proceedings," and "[o]f those thirty instances, twenty [were] of the type which may be characterized as coaching the district attorney." *Id.* at 421. Since a jury is highly susceptible to the actions of the judge, who they properly show great deference to, we ruled that this was reversible error. *Id.* at 422-24.

¶54. The alleged coaching in the instant case occurred during the testimony of Inspector Quinton. The prosecution had once again offered the .25 pistol into evidence. Defense counsel objected—an objection which the court sustained. The court then called the attorneys forward for a bench conference.[4]

¶55. The attorneys then zealously argued their points out of the presence of the jury. The prosecution wanted the pistol into evidence, but counsel for Dycus opposed the admission into evidence. The court truly split the difference—refusing to allow the evidence in at that point, and cautioning that it "would just rather wait until Dr. Hayne testifies." The court was aware of Dr. Hayne's great amount of experience in the forensic field.[5]

¶56. The prosecution was still adamant that the pistol be entered into evidence. The court refused at that time, but noted—out of the presence of the jury, but to both attorneys for the prosecution—that the evidence would probably be admitted.

¶57. Counsel for Dycus was silent nearly the entire exchange; the heated discussion came from the prosecution attempting to bring in the evidence. The trial court clearly found that there was no foundation at that time, stating to counsel that "there is no evidence to show that it was the gun that killed the victim." The alleged coaching comes near the end of the exchange, when the judge cautions the prosecution that

---

[4] The bench conference is duly recorded and transcribed, running to six pages. See assignment of error 24, *infra*.

[5] Dr. Hayne has testified in over sixty reported Mississippi cases.

after Dr. Hayne testifies, it would "give much more clout" to the pistol, and that it would "be much safer at that juncture" to try and offer the evidence.

¶58.    In *West* we found reversal when a judge constantly coached the prosecution in front of jury. There was no *West* coaching here; in fact, the record is completely devoid of anything which remotely resembles what occurred in *West*.

¶59.    Any discussion was had outside the presence of the jury, and it is clear from the record that the prosecution, at least, felt the trial court was hindering their case. The trial court was hindering neither side, but performing its duties to the letter of the law. The pistol was only admitted in after there was much evidence and testimony that was sufficient to support a finding that the weapon in question was indeed what it was claimed to be. *See* Miss. R. Evid. 901(a). There is no merit to the argument that the judge coached the prosecution.

### 5.  Did the trial court err by admitting Dycus's statement?

¶60.    We do not reverse a trial judge's decision to admit a confession unless it is manifestly in error or is against the overwhelming weight of the evidence. *See **Hunt v. State**,* 687 So.2d 1154, 1160 (Miss. 1996). Where the evidence is contradictory we generally affirm. *Id*. at 1160. Once the trial judge has determined that a confession is admissible, there is a heavy burden in attempting to reverse that decision on appeal. *Id*.

### a.  Dycus's  statement to Inspector Quinton at the police station

¶61.    Dycus asserts that his statement to Investigator Quinton at the police station should be inadmissible because he was under the influence of drugs and alcohol. Yet Dycus did not object to the admission of this alleged involuntary statement at trial. His failure to object at trial renders this issue procedurally barred. *See **Foster v. State**,* 639 So.2d 1263, 1270 (Miss. 1994).

¶62.    Notwithstanding the procedural bar, there is no evidence that the trial judge admitted the confession erroneously or against the weight of the evidence.[6]   Inspector Quinton testified that he found Dycus reasonable and understanding, and Dycus was repeatedly read his *Miranda* rights by interviewers.  Only later was testimony offered that Dycus was impaired by alcohol or drugs.  This issue is without merit.

### b.  Dycus's letter to Inspector Quinton

¶63.    Dycus argues that the written statement addressed to Inspector Quinton should not have been admitted because of his young age—seventeen at the time of the crime—and because a police officer and another inmate influenced him to draft the statement.

¶64.    Dycus's letter was addressed to Inspector Quinton and detailed his participation in the murder of Mrs. Pittman and the theft of her automobile.  The prosecution repeatedly tried, and failed, to have the letter admitted into evidence.  True to its cautionary nature, the trial court only allowed the letter into evidence after a fingerprint examiner from the Mississippi Crime Laboratory testified that nine of Dycus's fingerprints and three of his palm prints coated the letter.

¶65.    The record does not indicate that Dycus ever presented the defense of coercion.  This Court can only review issues that have been tried and examined by the courts below.  We cannot find error where the matter was never presented to the court below.  *See Milano v. State*, 790 So.2d 179, 189 (Miss. 2001).  Notwithstanding this procedural bar, Dycus does not point to any abuse of discretion committed by the trial court.  This issue is without merit.

### c.  The burden of proof

---

[6] We have the ability to address issues despite the procedural bar from our powers of review.  *See Harris v. Reed*, 489 U.S. 255, 259, 109 S.Ct. 1038, 1041, 103 L.Ed.2d 308 (1989).

¶66. Dycus asserts that the State retains the burden of proof that there is no reasonable probability that his statements contributed to the verdict. This issue was never raised to the trial court and cannot be considered here. *See Milano*, 790 So.2d at 189. The issue is barred and without merit.

**6. Is the Mississippi statute that excludes illiterate jurors unconstitutional?**

¶67. During voir dire the judge asked if the jurors could read and write, since Mississippi requires jurors to be literate. Section 13-5-1 of the Mississippi Code orders jurors to fill out a simple form, and "each juror who cannot complete the above form shall be disqualified as a juror and discharged."[7]

¶68. The trial court asked the jurors if there was "among us one who cannot read or write," and a prospective juror raised their hand. At that point the prospective juror was excused, without further examination. Dycus appeals and assigns multiple problems to this issue.

### a. Did the trial court need to ask further questions to determine if the juror was illiterate?

¶69. First, Dycus asserts that by failing to ask the prospective juror why they could not fill out the questionnaire the trial court may have unintentionally, but unlawfully, excluded a person who may not have been illiterate. Dycus urges that, for example, the person might simply have been unable to physically complete the form.

¶70. When the judge asked if there were any persons who could not read or write in the jury, one prospective juror raised his hand. Because he could not lawfully execute his duties as a juror, he was struck. There were no other questions needed to determine if the juror were illiterate other than the one asked.

---

[7] The form requests the juror's name, home address, occupation, age, telephone number, and the number of miles the prospective juror lives from the courthouse, plus a signature.

¶71. It has been said that "[p]erhaps the law need not always align itself with common sense, but when that happy coincidence occurs, lawyers and judges should not reflexively recoil from it." *Communications Workers of America v. Western Elec. Co.,* 860 F.2d 1137, 1142 (1st Cir. 1988). This is such a case, and this issue is without merit.

### b. Is the statute requiring a juror to be literate unconstitutional?

¶72. Dycus asserts that the statute requiring juror literacy might be unconstitutional. We have addressed this issue before. The current revised statute was held constitutional over thirty years ago in *Terrell v. State*, 262 So.2d 179 (Miss. 1972). For "[w]ith the infinite variety of cases now in our courts and the multitude of written documents entered into evidence, the requirement that a juror be able to read and write is a reasonable and nondiscriminatory regulation which operates equally against all persons tried by juries." *Id.* at 180. That statement, written long before the rise of the personal computer, electronic mail, and mass duplication of documents, rings even more true today.

¶73. By striking the prospective juror, the State gained no upper hand over Dycus. Indeed, both Dycus and the State are equally served by having a jury of citizens that are fully literate, since this affords Dycus a fairer trial. If there had been written evidence that might have exonerated Dycus, it would have had no effect on the illiterate juror.

¶74. It is firmly within the command of the Legislature to amend the juror literacy requirement, yet they have determined it serves a legitimate state interest and does not violate the constitutional rights of accused persons to be tried by an impartial jury. *See Wilson v. State*, 574 So.2d 1324, 1331 (Miss. 1990). Accordingly, this issue has no merit.

### c. Does the statute harm disabled persons contrary to the goal of the Legislature that all persons be treated equally?

¶75. Dycus contends that the statute requiring literacy asks for a juror to handwrite information on a card, and that a person who was physically disabled might have trouble filling out a card. Those are not the facts here, where a prospective juror voluntarily indicated to the trial court that they could not read or write. They did not indicate to the judge that they needed assistance in filling out the jury card. This issue has no merit.

¶76. Notwithstanding that conclusion, the statute does not work to thwart disabled jurors in any way. The statute mandates that the trial judge distribute the form "[i]n order to determine that prospective jurors can read and write." The heart of this statute is simply that the juror be able to comprehend the written word, and communicate it likewise. "Read and write" is simply a phrase used to indicate literacy. While the statute excludes illiterate jurors, it does not exclude disabled jurors. This assignment of error is without merit.

### 7. Did the prosecution commit a discovery violation by failing to disclose Dycus's statement?

¶77. Dycus asserts the prosecution committed a discovery violation by not disclosing to his counsel an oral statement he gave Inspector Quinton. Kelvin Dycus wrote a statement to the inspector detailing his involvement in the crime. Dycus verbally confirmed to the inspector that he had written the letter. Dycus now complains that the prosecution committed a discovery violation by not informing defense counsel that he had indeed orally confirmed his writing of the statement.

¶78. Rule 9.04 of the Uniform Circuit and County Court Rules governs discovery, and the relevant portions of the rule demands that "the prosecution must disclose to each defendant or to defendant's attorney [a] . . . [c]opy of any written or recorded statement of the defendant." Rule 9.04 also governs

19

how a trial court responds when "the prosecution attempts to introduce evidence which has not been timely disclosed to the defense."[8]  There are three steps the trial court should follow:

> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, examine the newly produced documents, photographs or other evidence; and
> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
> 3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

URCCC 9.04(I).  It is within our discretion to reverse if this rule is not strictly followed.  *See McGowen v. State*, 859 So.2d 320, 337 (Miss. 2003); *Harrison v. State*, 635 So.2d 894, 898 (Miss. 1994) ("Failure to strictly comply with Rule 4.06 is not necessarily fatal" to a case).  Moreover, "[w]hen confronted with an alleged Rule 4.06 violation, this Court must review the record to determine whether the judge followed the guideline enunciated" in the rule. *Harrison*, 635 So.2d at 898.

¶79.    An examination of the record reveals that the trial judge followed the procedure correctly.  In chambers and out of the presence of the jury, the trial judge conducted a hearing with only counsel for Dycus, counsel for the State, Inspector Quinton , and Dycus himself present.[9]  The trial court found that the information about which Dycus complains —that he orally admitted authoring a statement—"was not information gained for the first time . . . today," because the statement was uttered in the presence of counsel for the State and counsel for Dycus.

---

[8] Rule 9.04 is a codification of Justice Robertson's special concurrence in *Box v. State*, 437 So.2d 19 (Miss. 1983), which established how a trial court manages evidence which has not been timely disclosed.  *See also McGowen v. State*, 859 So.2d 320, 337 (Miss. 2003).

[9] The transcript for this hearing in chambers, which started as a bench conference out of the presence of the jury,  is complete and runs to twelve pages.  See assignment of error 24, *infra*.

¶80.    Therefore, Rule 9.04 is not even applicable, for this was not "new" evidence—it had already been disclosed to counsel for Dycus. Notwithstanding that bar, Dycus still contends that this old evidence somehow caused him "surprise or undue prejudice," which should have resulted in a continuance or mistrial in the court below.

¶81.    Even if the information had been absolutely new, which it was not, there would have been no surprise or undue prejudice to Dycus. It was a simple statement made in the presence of the judge, the district attorney, and his own lawyer regarding a handwritten statement which was barely contested at trial. The trial court made the proper ruling on the issue.

¶82.    The reason Rule 9.04 exists is because our "[f]irst and foremost . . . concern is with fairness, with avoiding unfair surprise to either the state or the defense." *Box*, 437 So.2d at 24 (Robertson, J., specially concurring). There was no unfair surprise to Dycus in this case. There is no reversible discovery violation, and this issue is wholly without merit.

### 8. Did the trial court err when it allowed the jury to view photographs of the victim?

¶83.    Dycus asserts that the trial court erred in admitting explicit photographs of the body of Mrs. Pittman. He argues this inflamed the jury's passions and that the photographs prejudiced his defense.

¶84.    We allow a trial judge broad discretion in admitting photographs, and as long as the photographs supplement or add clarity to the testimony of witnesses we will find no abuse of discretion. *McGowen*, 859 So.2d at 341. If photographs are merely gruesome or inflammatory and lack an evidentiary purpose, they are never admissible as evidence. *See Snow v. State*, 800 So.2d 472, 491 (Miss. 2001). Yet "[t]he decision of whether to admit photographs is within the sound discretion of the trial court," and we only require "[s]ome 'probative value' . . . to buttress a trial judge's decision to

allow photographs into evidence." *Id*. at 491. In addition, "photographs have evidentiary value when they: (1) aid in describing the circumstances around the killing . . . (2) where they describe the location of the body and the cause of death; or (3) where they supplement or clarify witness testimony." *Jones v. State*, 776 So.2d 643, 652 (Miss. 2000) (internal quotation marks omitted).

¶85.    Here, the photographs were used at trial to assist Dr. Hayne and other witnesses in describing the wounds that Mrs. Pittman suffered, the circumstances in which she was attacked, and the possible ways that they were inflicted upon her. They described the location of her body and the cause of her death.

¶86.    The photographs were not used to inflame the jury's passions, but to show that the wounds inflicted were indeed by a .25 caliber weapon, which tended to prove that the Dycus brothers committed the crime. The photographs contained sufficient probative evidentiary value to outweigh any prejudice Dycus may have suffered. The trial court did not abuse its discretion, and this assignment of error has no merit.

### 9.  Did the jurors fail to consider mitigating evidence or weigh aggravating and mitigating factors properly?

#### a.  Were the instructions given to the jury confusing?

¶87.    Dycus alleges that during the sentencing phase of his trial the trial court issued unclear, ambiguous, and confusing instructions to the jury. Dycus reasons that this indicates the jury lacked a clear understanding of the instructions and could not apply them in a manner which guaranteed his constitutional rights.

¶88.    The jury was certainly presented with mitigating evidence during the sentencing phase of the trial, after the jury had already rendered a guilty verdict on the counts of capital murder and auto theft. Dycus's mother, Betty, and his aunt, Sue Hardwick, both offered evidence of a difficult childhood fraught

with a neglectful father, an alcoholic mother, and an older sibling who shouldered most of the parenting duties.

¶89. The jury duly considered this evidence and still proclaimed the death sentence for Dycus. Dycus offers that perhaps the jury was confused by the trial judge's reading of the sentencing instructions to the jury, a reading which was originally inaccurate.

¶90. The judge read the following instruction to the jury: "Should you find that the mitigating circumstances outweigh or overcome the aggravating circumstances, *you shall impose* the death penalty." (emphasis added). Dycus quickly objected to the improper form of the instruction, because if mitigating circumstances outweigh aggravating circumstances, the death penalty *should not* be imposed.

¶91. A bench conference between counsel for the State, the judge, and counsel for Dycus was quickly gathered out of the hearing of the jury.[10] Counsel for Dycus brought to the court's attention the accidental mistake—that the word "not" was left out of the instruction.

¶92. The judge immediately corrected the mistake, instructing the jury that "[s]hould you find that the mitigating circumstances outweigh or overcome the aggravating circumstances, *you shall not impose* the death sentence." (emphasis added). Dycus offered no further objection to the reading of the instructions. Now, on appeal, he urges that the trial court should have clarified to the jury that only the second instruction applied.

¶93. Yet Dycus failed to object to the corrective instruction when it was given. Indeed, it was his alert counsel which roused the judge to his misstatement. If there was no contemporaneous objection, Dycus cannot raise that argument here. *See **Foster***, 639 So.2d at 1270.

---

[10] This bench conference was duly recorded and transcribed. See assignment of error 24, *infra*.

¶94. Notwithstanding that bar, common sense counters Dycus's argument. The judge clearly withdrew his earlier statement when he read the correct instruction to the jury. In addition, counsel for Dycus was allowed closing argument soon after the alleged error, and placed ample weight on mitigating factors, emphasizing Dycus's troubled home life and the seriousness of the death penalty. The record indicates the jury understood and applied statutory terminology in written and oral findings.

¶95. Even more specifically, the jury unanimously declared that there were "insufficient mitigating circumstances to outweigh the aggravating circumstances." The jury understood the instructions completely; it simply did not find that a difficult childhood excused the murder of a defenseless senior citizen. This issue is without merit.

### b. Was the fact that the jury returned two separate verdicts a sign of confusion?

¶96. The jury wrote its sentence of death on a jury form. The jury also handwrote on a separate sheet of paper, also duly signed, its determination of mitigating or aggravating factors.

¶97. Dycus argues this shows the jury was confused. Yet it was repeatedly emphasized to the jury that Dycus could only be sentenced to death if it made "a written finding" that Dycus "actually killed," "attempted to kill," "intended a killing take place," or "contemplated that lethal force would be employed." Miss. Code Ann. § 99-19-101(7).

¶98. While the jury may have been repetitious in rendering its verdict, the meaning sent is clear and unambiguous. It found Dycus guilty on both counts and sentenced him to die for his crime of capital murder. This issue is without merit.

### 10. Were the jury's findings against the overwhelming weight of the evidence?

24

¶99.   The jury determined that Dycus committed murder for the purpose of avoiding or preventing a lawful arrest; Dycus argues this finding is against the overwhelming weight of the evidence and wholly inconsistent with the jury's finding that Dycus neither personally killed, nor intended to kill, Mrs. Pittman.

¶100.   Miss. Code Ann. § 99-19-101(5), which governs aggravating circumstances, includes the following situations:

> (d) The capital offense was committed while the defendant . . . was an accomplice, in the commission of . . . any robbery . . .
> (e) The capital offense was committed for the purpose of avoiding . . . a lawful arrest . . .
> (f) The capital offense was committed for pecuniary gain.
>          . . .
> (h) The capital offense was especially heinous, atrocious or cruel.

The facts show that, regarding part (d), that Mrs. Pittman was murdered while Kelvin Dycus and his brother Jason were robbing her of cash, checks, and food stamps; they were charged with the theft of her car.

¶101.   The facts pertaining to part (e) show that the jury found that Mrs. Pittman was murdered after she identified the Dycus brothers as "the boys from across the street." It was reasonable that the jury found that murder was committed to avoid being arrested for the robbery.

¶102.   The facts concerning part (f) are that Kelvin and Jason realized financial gain from their murder and robbery of Mrs. Pittman. The facts concerning (h) will be discussed below.

¶103.   Only part (d) is pivotal, as Dycus argues that it was against the overwhelming weight of the evidence. The code section does not require that the defendant be the actual trigger person, simply that they be an accomplice in the crime. Evidence presented at trial showed that Kelvin's brother Jason may

have been the actual person who shot Mrs. Pittman in the head, the injury which ultimately resulted in her death.

¶104.    It was Kelvin who beat Mrs. Pittman about the head with a lamp until it shattered, who shot her in her arm even after she had been shot in the back of the head, and who drove her stolen car. The jury made absolutely no error in determining that the "capital offense was committed while the defendant . . . was an accomplice . . . in the commission of . . . robbery." This assignment of error is without merit.

¶105.    Dycus also attempts to evade his punishment by arguing that he did not "mean" to kill Mrs. Pittman.   When a person kills another person in Mississippi under certain circumstances, their intent is irrelevant.  For capital murder is "[t]he killing of a human being . . . when done *with or without any design to effect death*, by any person engaged in the commission of the crime of . . . robbery." Miss. Code. Ann. § 97-3-19(2)(e) (emphasis added).  Dycus also "contemplated that lethal force would be employed" in the crime, since he and his brother were using the .25 caliber automatic pistol. *See* Miss. Code Ann. § 99-19-101(7).

¶106.    Even if Dycus did not mean to murder Mrs. Pittman, the underlying robbery of her Chevrolet and the use of lethal force erased all questions of innocence.  The Legislature has decreed that when a person is murdered during a rape, a burglary, a kidnapping, arson, and other heinous crimes, or when they contemplate the use of lethal force against another person, then they may be sentenced with the ultimate penalty.  The intent is to deter these crimes and to preserve the value of human life.  A jury of his peers determined that Dycus committed robbery, and during that robbery, a woman died.  This finding is not against the weight of the evidence.  This assignment of error has no merit.

### 11. Did the trial court err by allowing the prosecution to submit evidence that the murder was heinous, atrocious, or cruel?

26

### a. Submission of the aggravating factors to the jury

¶107. Dycus argues that the jury should never have been issued an instruction that the murder might be "heinous, atrocious, or cruel," because he neither killed, nor meant to kill, Mrs. Pittman.

¶108. Dycus did not object to the aggravating factors instruction; indeed, he agreed to it. We cannot now focus on what Dycus ignored or agreed to at the trial level. This situation mirrors *Jones v. State*, 776 So.2d 643, 652 (Miss. 2000), and *Butler v. State*, 544 So.2d 816, 818 (Miss.1989).

¶109. As in the case at hand, in those two cases objections were not made to the instructions. We held there, as we do here, that failure to object to the instructions bars raising the issue on appeal. *Jones*, 776 So. 2d at 652; *Butler*, 544 So. 2d at 818. This issue is thus without merit.

¶110. Notwithstanding that bar, Dycus's intentions towards Mrs. Pittman are irrelevant in terms of the applicable law. As noted above, Section 97-3-19(2)(e) defines capital murder as "[t]he killing of a human being . . . when done *with or without any design to effect death*, by any person engaged in the commission of the crime of . . . robbery." (emphasis added). This instruction was not invalid.

### b. Sufficiency of the evidence

¶111. Dycus argues that there was insufficient evidence to convince a reasonable juror that the murder was heinous, atrocious, or cruel. Our standard of review for a sufficiency of the evidence claim requires us to view all evidence and all reasonable inferences which may be drawn from that evidence in the light most consistent with the verdict. We have no authority to disturb the verdict of the jury unless no rational trier of fact could have found the fact at issue beyond a reasonable doubt. *See Ballenger v. State*, 667 So.2d 1242, 1259 (Miss. 1995).

¶112. To briefly restate the facts: a seventy-six-year-old woman, weak from a recent stay in the hospital, opened the door of the home she had lived in for forty years. She was battered about the face and head

27

with a handgun; her arms were tied together, behind her back; she was dragged through her home on her knees. She was beaten about the head with a lamp until it broke. She was pushed face down on her own bed and shot through the back of the head. The movements of her dying body prompted her assailants to shoot her again. The assailants robbed her of a few dollars and a handful of food stamps and her decade-old car. They drove to the home of an acquaintance where they used drugs, drank beer, and played cards.

¶113. A reasonable juror could find that this murder was heinous, atrocious, or cruel, and issue a verdict accordingly. The evidence against Kelvin Dycus is overwhelming. The assignment of error is without merit.

### c. The constitutionality of the trial court's aggravation instruction

¶114. Dycus argues that the aggravation instruction is unconstitutionally vague and overbroad. The instruction is in two parts:

> The Court instructs the jury in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
>
> An especially heinous, atrocious or cruel capital offense is one accompanied by additional acts as to set the crime apart from the norm of capital murders- -the conscienceless or pitiless crime which is unnecessarily torturous to the victim. If you find from the evidence beyond a reasonable doubt that the defendant utilized a method of killing which caused serious mutilation, that there was dismemberment of the body prior to death, that the defendant inflicted physical or mental torture and aggravation before death, or that a lingering or torturous death was suffered by the victim, then you may find this aggravating circumstance.

¶115. An instruction that includes only the first section above is constitutionally inadequate, because it is "insufficient to adequately channel the jury's discretion." *Jenkins v. State*, 607 So.2d 1171, 1181 (Miss. 1992). *See also* **Shell v. Mississippi**, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1, 4 (1990).

¶116. Yet when the entire instruction is given, it properly narrows the jury's consideration of the aggravating circumstances. *See Davis v. State*, 684 So.2d 643, 662 (Miss. 1996); *Jenkins*, 607 So. 2d at 1182. Here, the trial judge provided the entire instruction to the jury, thus affording Dycus full protection from unclear instructions. The issue is without merit.

## 12. Did the prosecution make improper arguments that infringed upon Dycus's ability to receive a fair trial?

### a. Was it improper for the prosecution to remark that Jason could not receive the death penalty?

¶117. Dycus argues that the prosecution made improper comments about his brother Jason's age—especially regarding the death penalty.

¶118. It is undisputed that Jason Dycus was fifteen at the time Mrs. Pittman was murdered. In the prosecution's opening statement Jason was referred to, with the caveat that he could not receive the death penalty because of his age. Dycus did not object at the time the statement was made or at the end of the prosecutor's closing statement, nor did he address the issue in his own opening statement. Because he did not contemporaneously object, Dycus cannot raise that argument on appeal. *See Foster*, 639 So.2d at 1270.

¶119. Notwithstanding that bar, the matter of Jason's age arose later in the trial. Jason Dycus later testified in his brother's defense. On cross-examination, the State informed the court that both parties had entered into a stipulation. The stipulation was simple: "[t]hat under the law and because of his age at the time of commission of the crime of capital murder, Jason Dycus could not have been given the death sentence."

¶120.   The Court asked counsel for Dycus if that was the stipulation that parties had agreed to, and Dycus indeed accepted it.  The Court then informed the jury that they should "consider that [fact] as having been conclusively proven, consider that a genuine fact."

¶121.   "A stipulated fact is one which both parties agree is true," and "[w]here the parties file and gain court approval of a formal stipulation agreement . . . the factual issues addressed in the agreement are *forever settled* and excluded from controversy." **Wilbourn v. Hobson,** 608 So.2d 1187, 1189 (Miss. 1992) (emphasis added).  "Neither party can later change positions," and those "stipulations set boundaries beyond which this Court cannot stray."  ***Id.*** at 1189.

¶122.   We are bound, as is Dycus, by the very stipulation he entered into.  While he may regret the inferences the stipulation brings, or the stipulation itself, we cannot disturb it.  This assignment of error has no merit.

### b.  Did the prosecution make improper statements about Kelvin's age?

¶123.   Dycus argues the prosecution repeatedly tried to make his age and his brother's age an issue in the closing arguments of the trial, essentially attempting to make him bear the brunt of his brother's crimes as well.  Dycus also offers that the prosecution tried to cast his age in an aggravating manner when it argued that he was not a boy but a young man.

¶124.   We allow attorneys wide latitude in their closing arguments, and any allegedly improper prosecutorial comment must be evaluated in the context of the circumstances of the case.  ***Davis v. State***, 660 So.2d 1228, 1248 (Miss. 1995).  We will reverse if the natural and probable effect of the argument of the prosecuting attorney creates an unjust prejudice against the accused and if that argument actually results in a decision influenced by the prejudice.  ***Id.*** at 1248.

¶125. There are references in the closing arguments of the prosecution to Kelvin's younger brother and his immunity from the death penalty. Nonetheless, both of those situations are meant to attack the testimony of Jason as to Kelvin's relative innocence, for Jason testified in defense of his brother. In the first instance, the prosecution argued that:

> The point of the matter is, ladies and gentlemen, [is that Kelvin] aided and abetted. He acted in concert. [That's] [n]ot the story that his brother comes in here and wants to tell you today[,] because he's pled guilty. He can't get the death penalty because of his age at the time. He knows what his brother is facing.
>                                  * * *
> And so he comes here and he wants to help his brother. So he says well, I did it all. Ladies and gentlemen, I submit to you that you didn't believe a word he said on that witness stand. And you know what his motivation was for coming in here was to lie for his brother.

Later in the closing argument the prosecution argued:

> But you have to use your good common sense and you are to weigh all of that and you're to weigh the fact that the defendant has asked his brother, Jason Dycus, who is now immuned from the penalty that he deserves, and he comes up here and he takes the stand in front of you and he says I liked to the officer that night when I said that we did this and . . . I did it all and [Kelvin] just kind of followed me.

¶126. It is clear from a reading of these statements that the State was not attempting to make Kelvin a scapegoat for his brother, but rather to make the jury doubt the truthfulness of Jason's testimony. In fact, the prosecution disregarded great chunks of Jason Dycus's testimony, most of which attempted to exonerate Kelvin, in order to present evidence against Kelvin. The effort was not to scapegoat Kelvin with Jason's crimes; it was to convince the jury that Jason was lying and that Kelvin was guilty.

¶127. There is likewise no prejudice in the prosecution saying the Dycus brothers "aren't boys," but "young men." We grant a large amount of deference to the composition of an attorney's closing argument. *See **Berry**,* 703 So. 2d at 278. This assignment of error has no merit.

### 13. Did the trial court err in instructing the jury regarding simple murder?

31

### a. Instruction on a lesser-included offense

¶128.   Dycus argues that he was deprived of his right to a lesser-included offense instruction, arguing that the jury should have been instructed to consider felony manslaughter rather than, or in addition to, simple murder.

¶129.   Jury instructions are to be read together and understood as a whole, with no one instruction taken out of context.  *See Austin v. State*, 784 So.2d 186, 192 (Miss. 2001).  While a defendant is entitled to have jury instructions given which present his theory of the case, the court may refuse an instruction which incorrectly states the law, or an instruction that contains information covered fairly elsewhere in the instructions, or is without foundation in the evidence.  *Id*.

¶130.   The manslaughter statute explicitly excepts robbery from its provisions.  *See* Miss. Code Ann. § 97-3-27.[11]  We cannot find error with the trial court for refusing to give an instruction that misstates the law.  *See Allman v. State*, 571 So.2d 244, 250 (Miss. 1990).  This assignment of error is without merit.

### b. The constitutionality of Mississippi's capital punishment statute

¶131.    Dycus avers that the Mississippi capital punishment statute is unconstitutional on its face for two reasons: first, that it does not furnish a principled means of distinguishing a defendant's eligibility for the death penalty; and secondly, that it violates the Eighth and Fourteenth Amendments of the United States Constitution because it does not furnish a principled means of distinguishing defendants who receive the death penalty.  Essentially, Dycus's argument is that the statute violates the Eighth and Fourteenth Amendments because it punishes simple felony murderers more harshly than premeditated murderers.  Dycus also contends that Mississippi has no rational or historical basis for this sentencing.

---

[11] The statute explicitly exempts "those felonies enumerated in Section 97-3-19(2)(e) and (f)," which includes in pertinent part "robbery . . . or . . . any attempt to commit [robbery]."

¶132.  We reviewed the points Dycus raises in *Evans v. State*, 725 So.2d 613 (Miss. 1997). There we undertook a massive "critical review" of our death penalty sentencing process in light of changes in United States Supreme Court jurisprudence and evolving statutory law, and found it constitutional. *Id.* at 684. We do not disturb that ruling today and maintain that our capital punishment statute is constitutional. This assignment of error is without merit.

### 14.  Did the instruction to the jury insist that the jury disregard all sympathy?

¶133.  Dycus contends that the trial court committed error in instructing the jury that it could not consider sympathy in his sentencing. The instruction reads in pertinent part that a juror "should consider and weigh any aggravating and mitigating circumstances . . . but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Dycus did not object to this instruction and is procedurally barred from raising it for the first time on appeal. *See Foster*, 639 So.2d at 1270.

¶134.  Notwithstanding that bar, we will consider the arguments of the accused. Dycus argues that the "a jury may not be instructed to disregard, *in toto*, sympathy." *Pinkney*, 538 So.2d at 351. This is wholly correct. A jury may properly consider mitigating evidence—including sympathy—when it contemplates and renders a verdict.

¶135.  Yet a jury may not consider *only* sympathy, or passion, or prejudice. That is the warning this instruction provides to a jury, and each time we have considered this instruction we have held accordingly. An instruction that does not inform the jury that it must *completely* disregard sympathy and that leaves the option to vote for or against the death penalty is a proper statement of law. *See Blue v. State*, 674 So.2d 1184, 1225 (Miss. 1996); *Willie v. State*, 585 So.2d 660, 677 (Miss.1991).

¶136. In *King,* the trial judge repeatedly informed a jury that they "must not consider sympathy as part of the case." *Id.* at 889. For guidance, we looked to *Blue* and *Willie* and the very same instruction that Kelvin Dycus now objects to; we again found that "'the instruction is proper statement of law.'" *Id*. at 889 (quoting *Blue*, 674 So. 2d at 1225). It is never a proper statement of the law to tell a jury to completely disregard sympathy, as the judge in *King* did. This instruction does not do that and is, therefore, valid. *See also Flowers v. State*, 842 So. 2d 531, 563 (Miss. 2003) (citing to both *King* and *Blue* when upholding the very same jury instruction at issue here). The instruction that was provided to the jury was accurate. This issue is without merit.

**15. Is a sentence of death for a seventeen year old unconstitutional?**

*a. Eighth Amendment's prohibition against cruel and unusual punishment*

¶137. Dycus argues, as he did above, that executing him would violate the Eighth Amendment prohibition against cruel and unusual punishment. "The Eighth Amendment prohibitions have been made applicable to the States through the Fourteenth Amendment of the United States Constitution," and "Article 3, § 28 of the Mississippi Constitution forbids the infliction of 'cruel or unusual punishment.'" *Foster v. State*, 639 So.2d 1263, 1295 (Miss. 1994).

¶138. Dycus was seventeen years old when he was sentenced to death for his crimes, and he urges that his youth might exempt him from such a punishment. This is not a correct statement of the law. Indeed, capital punishment for persons of Dycus' age has a historical grounding. "At that time [the Bill of Rights was adopted], the common law set the rebuttable presumption of incapacity to commit any felony at the age of 14, and theoretically permitted capital punishment to be imposed on anyone over the age of 7." *Stanford v. Kentucky*, 492 U.S. 361, 368, 109 S.Ct. 2969, 2974, 106 L.Ed.2d 306 (1989).

34

¶139. In addition, "a majority of the States that permit capital punishment authorize it for crimes committed at age 16 or above." ***Id.*** at 371. Ultimately, the United States Supreme Court has concluded that there is "neither a historical nor a modern societal consensus forbidding the imposition of capital punishment on any person who murders at 16 or 17 years of age . . . [and so] such punishment does not offend the Eighth Amendment's prohibition against cruel and unusual punishment." ***Id.*** at 380. We have no legal basis for ruling contrary to such a holding. This issue has no merit.

### b. Supremacy Clause of Article VI of the United States Constitution

### c. The doctrine of Jus Cogens

### d. The International Covenant on Civil and Political Rights

¶140. Because sub-issues (b), (c) and (d) are interrelated, they will be discussed simultaneously. Dycus argues that international law applies in this case. However, this is an appeal concerning a crime committed in the State of Mississippi and heard by a Mississippi state court. Dycus has cited no applicable laws in the United States nor in Mississippi where international law has been applied to a death penalty case in a state court. This issue is without merit.

### 16. Did the jury's findings require a new capital sentencing proceeding?

¶141. Dycus contends that the findings of the jury are invalid because of insufficient evidence. Dycus further contends that this Court cannot reweigh any remaining aggravating circumstances against the mitigating circumstances or engage in harmless error analysis.

¶142. The jury unanimously agreed to three aggravating factors: (1) that the capital offense was committed for the purpose of avoiding legal arrest; (2) that the capital offense was committed while the defendant was engaged in the commission of robbery; and (3) that the capital offense was especially heinous, atrocious or cruel. There was sufficient evidence for the jury to find that the crime committed was heinous, atrocious

and cruel. Moreover, the finding that Dycus committed the crime for the purpose of avoiding lawful arrest is supported by the evidence.

¶143. Generally, an aggravating factor is valid when accompanied by a limiting instruction. *See Jones*, 601 So. 2d at 1172. No limiting instruction is necessary "if there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance." *Walker v. State*, 671 So.2d 581, 611 (Miss. 1995).

¶144. There was testimony at trial that Dycus wore pantyhose over his face to disguise his identity and rubber gloves to eliminate fingerprints; indeed, when he was arrested these items were on his person. There was also testimony that Mrs. Pittman recognized the Dycus brothers and that they murdered her after this identification. These facts are sufficient to support a jury finding that Kelvin murdered Mrs. Pittman to avoid detection and apprehension. As a result, this issue is without merit.

## 17. Did prosecutorial misconduct prejudice Dycus's right to a fair trial?

¶145. Dycus argues that the prosecution has a documented history of prosecutorial misconduct. The State correctly asserts that Dycus does not identify any particular instances during the trial below where there was misconduct. A failure to address an issue can act as a waiver on appeal. *Cook v. Mardi Gras Casino Corp.*, 697 So.2d 378, 383 (Miss. 1997). Since Dycus provided no support for his argument, this assignment of error has no merit.

## 18. Did the prosecution misrepresent Jason Dycus's immunity to the jury?

¶146. Dycus argues that the prosecutor improperly stated that Jason was immune from prosecution when in reality Jason agreed to a plea bargain giving him life in prison without parole. Dycus has not cited any

relevant authority in support of this issue. We remain steadfast to the rule that failure to cite any authority may be treated as a procedural bar, relieving us of any obligation to consider the assignment. *See McClain v. State*, 625 So.2d 774, 781 (Miss. 1993); *Brown v. State*, 534 So.2d 1019, 1023 (Miss. 1988); *Shive v. State*, 507 So.2d 898, 900 (Miss. 1987); *Pate v. State*, 419 So.2d 1324, 1326 (Miss.1982).[12]

### 19. Did the prosecution improperly refer to the characteristics of the victim?

¶147.    Dycus alleges that during opening statement and closing argument the State made highly inflammatory and irrelevant references to Mrs. Pittman. For example, during the sentencing phase of the trial, the State went into detail about Mrs. Pittman—that she was seventy-six years old, that she had lived for forty years in the same house on the same street, that "[s]he made cookies for neighbors."

¶148.    During the closing argument, the prosecution showed the jury of a photo of the body of Mrs. Pittman, pointing out that near her purse was the handicap sticker for her car. The State also pointed out that Mrs. Pittman had recently recovered from a serious bout with cancer. Dycus made no objections to any of the statements in the record of which he now complains. He is thus barred from raising those objections here. *See Foster*, 639 So.2d at 1270. Notwithstanding that bar, we may still address the issue. Evidence of the victim's character is admissible if it is relevant to the crime. *See Randall v. State*, 806 So.2d 185, 225 (Miss. 2001); *Mack v. State*, 650 So.2d 1289 (Miss. 1994); *Hansen v. State*, 592 So.2d 114, 146-47 (Miss. 1991).

¶149.    Additionally, we accord wide latitude to attorneys in making their closing arguments.

---

[12] This procedural bar works against the party in a civil case who fails to cite any authority as well. *See Entergy Miss. Inc. v. Bolden*, 854 So.2d 1051, 1062 (Miss. 2003); *Read v. Southern Pine Elec. Power Assn.*, 515 So.2d 916, 921 (Miss. 1987). It is not absolute, for the failure *may* be treated as a procedural bar, and while we are under no obligation to review the issue, we may decide to examine it.

***Berry v. State***, 703 So.2d 269, 278 (Miss. 1997). Attorneys are also allowed a wide latitude in arguing their cases to the jury, including opening statements and closing arguments. ***Sheppard v. State***, 777 So.2d 659, 661 (Miss. 2000). However, prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury. ***Hiter v. State***, 660 So.2d 961, 966 (Miss.1995). We review alleged lawyer misconduct during opening statements or closing arguments by weighing if the natural and probable effect of the improper argument both creates unjust prejudice against the accused and results in a decision influenced by that prejudice. *See **McGowen***, 859 So.2d at 346.

¶150. Even if Dycus's argument was not barred, we would not find that the relatively minor statements of the prosecution regarding the characteristics of Mrs. Pittman would have resulted in prejudice so substantial that it influenced the outcome of the trial. This issue is without merit.

### 20. Did the prosecution argue matters outside the record?

¶151. Dycus argues that the prosecution argued a matter outside the record and scope of the trial when he told the jury in his closing argument that "Mr. Dycus is not against execution. He's not against death."

¶152. Dycus did not object to these statements at trial, thus barring us from considering this issue. *See **Foster***, 639 So.2d at 1270. Moreover, he did not cite to any authority in his assignment of error, which also bars our consideration of this issue. *See **McClain***, 625 So.2d at 781. Notwithstanding this double bar, we contemplate the assignment of error.

¶153. The boundaries within which an attorney travels in their presentation of a case are well-established, limiting counsel to the facts introduced in evidence, deductions and conclusions that may be reasonably drawn from those facts, and the application of the law to the facts. *See **Simmons v. State***, 805 So.2d 452, 493 (Miss. 2001). In the case at hand, there was no evidence introduced that Dycus was in favor of or against the death penalty. A reasonable observer might comment that no person in danger of receiving

the death penalty would be for it.

¶154. Yet it cannot be emphasized enough that we accord wide latitude to attorneys in making their closing arguments. *See Berry*, 703 So.2d at 278. If an attorney feels the other party is pushing that deference too far, it is completely within their power to object. If an attorney does not object, we are barred from considering the issue.

¶155. Notwithstanding the double bar that works against Dycus, the minor statements of the prosecutor pale in light of the facts and evidence admitted at trial. This assignment has no merit.

### 21. Was there prosecutorial misconduct during the closing arguments?

¶156. We review alleged prosecutorial misconduct during closing arguments by determining if the natural and probable effect of the improper argument both creates unjust prejudice against the accused and results in a decision influenced by that prejudice. *See McGowen*, 859 So.2d at 346.

¶157. Dycus argues the prosecution impermissibly relied on religious authority in its closing argument. The prosecution told the jury that "from the very beginning in Genesis[,] it was set out in the first book of the Bible[,] that when a man sheds a man's blood, that means when somebody kills a fellow human being, by man shall his blood be shed."[13]

¶158. Dycus cannot appeal this alleged impropriety because he did not make a contemporaneous objection. *See Foster*, 639 So.2d at 1270. In addition, defense counsel relied on religious authority in closing arguments as well, offering that since the prosecution "has read a biblical passage for you . . . I will get into other biblical quotes." Counsel for Dycus then proposed to the jury that while "[t]he old testament

---

[13] The prosecution alluded to the passage which announces "[w]hoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man." *Genesis* 9:6 (King James).

was for the punishment . . . the new testament is forgiveness, to turn the other cheek."[14]  That indicates to this Court that Dycus  did not find the use of religious imagery as offensive or as persuasive as he now suggests.

¶159.   Notwithstanding  the bar, we will examine the issue. Again, our courts  grant leeway to attorneys during closing argument. *See* **Berry**, 703 So.2d at 278. We also note that "[c]ourts should be very careful in limiting the free play of ideas, imagery and the personalities of counsel in their argument to a jury, "because those are the tools of a zealous advocate, and are " inherent in, and indispensable to, our adversary system." *Johnson v. State*, 477 So.2d 196, 209 (Miss. 1985).

¶160.   Over seventy years ago we examined this very issue, and we found that "[s]ome of the greatest speeches in our history have been made within the courthouse."  **Nelms & Blum Co. v. Fink**, 159 Miss. 372, 131 So. 817, 820 (1930).  In **Nelms & Blum**, Presiding Justice Ethridge conjured up an attorney of fantastic skill and zeal, emphasizing the great range of options available to counsel at closing argument:

> Counsel may draw upon literature, history, science, religion, and philosophy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thought and experience; he may, if he will, take the wings of the morning and fly not only to the uttermost parts of the sea but to the uttermost limits of space in search of illustrations, similes, and metaphors to adorn his argument. He may reach the uttermost heights of attainable eloquence, soar into the empyrean heights where his shadow may fall on the loftiest mountain top, as the eagle in its loftiest flight. He may borrow from every source, modern and ancient, such materials as he needs for his argument. He may clothe the common occurrences of life in the habiliments of poetry and give to airy nothings a habitation and a name. He may weave of words a rhetorical bouquet that enchants the ear and mesmerizes the mind. He may make the learning of the ages the servant of his tongue. His argument may be as profound as logic and learning can make them. He may give wing to his wit and play to his imagination so long as he does not imagine fact not in evidence, which the court does not take judicial knowledge of, or does not go out of the record for the facts not in evidence. As to the facts in evidence,

---

[14] The allusion is  to two different sayings attributed to Jesus.  In one of the Gospels it is related as "whosoever shall smite thee on thy right cheek, turn to him the other also."  *Matthew* 5:39 (King James).  It has also been transcribed as "him that smiteth thee on the one cheek offer also the other."  *Luke* 6:29 (King James).

he may array them in such figures and form and clothe them with such ideas and conclusions as he can conjure up in his mind for the best interest of his cause. He cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence.

*Id.* at 820-22. *Accord Flowers v. State*, 842 So.2d 531, 554 (Miss. 2003); *Johnson v. State*, 416 So.2d 383, 391-92 (Miss. 1982). No better illustration of the power of the closing argument exists.

¶161. The prosecution used the incidental reference to the Bible to illustrate a point to the jury. The defense did the same thing. This is well within the boundaries we have established for closing arguments. There is no error.

### 22. Did the prosecution misstate the law?

¶162. Dycus argues that the prosecution committed misconduct by urging to the jury that their responsibility was to return a verdict of death; that an overt attempt was made to encourage the jury to disregard mitigating evidence; and that the prosecution misled the jury by implying that they shared a common mission.

¶163. Dycus failed to object to this behavior at trial, and so is barred from raising this issue on appeal. *See Foster,* 639 So.2d at 1270. Notwithstanding that bar, we may examine his arguments. The prosecution argued to the jury in closing argument at the sentencing phase that "not only did [he] have a responsibility ... to ask you to return a death penalty ... as jurors you have the responsibility to see that justice takes place." The prosecution finished the statement by telling the jury that "although [a sentence of death] may not be a decision that we just naturally want to make ... we don't shrink back from it because [Kelvin Dycus] chose his actions." (emphasis added).

¶164. As we have noted above, we grant great deference to attorneys during their closing arguments. *See Berry*, 703 So.2d at 278. Urging the jury that they have a responsibility to see that justice takes place,

leaving some inference that it is a job they share with the prosecution, is nothing but a "rhetorical bouquet that enchants the ear and mesmerizes the mind." *Nelms & Blum*, 131 So. at 821. There is no error.

¶165. At closing argument the prosecution also asked the jury if they had ever known a person who had been deprived like Kelvin Dycus, and if they did, "did they ever murder somebody because of this? Did they ever excuse capital murder because of this? Does this excuse [Dycus] for what he did?"

¶166. The prosecution was clearly attacking the mitigating evidence Dycus had offered in his defense. The prosecution was simply addressing the facts of Dycus's life that were in evidence and is allowed to "array them in such figures and form and clothe them with such ideas and conclusions as he can conjure up in his mind for the best interest of his cause." *Nelms & Blum*, 131 So. at 821. There is no error.

### 23. Did the prosecution attempt to inflame the jury through improper means?

¶167. Dycus argues that the prosecution introduced prejudicial and inadmissible evidence at the trial through the testimony of Danny Davis, a witness for the prosecution. The alleged evidence occurred during direct examination.

¶168. The direct examination transpired as follows:

> [The State]: Do you know Kelvin Dycus? I mean, did you know him to see him on that day?
> [Danny Davis]: Uh, I've been knowing these boys for over a period of time. They used to call my house and threaten me all the time, you know, because I was dating their cousin's girlfriend.
> BY MR. WONG [Counsel for Dycus]: Objection, your Honor, irrelevant.
> BY MR. MELLEN [Counsel for the prosecution]: Well, it shows how he knew him. It's probably not relevant, but - -
> BY THE COURT: Sustained.
> BY MR. MELLEN: (Continuing).
> Q. I want to ask you if you saw the defendant, Kelvin Dycus, this Monday while we were here in the witness room?
> A. Yes, sir, I did.
> Q. The first time you saw Kelvin Dycus, would you tell the jury what happened?

A. They were bringing him out of the little room that they keep him in and he walked by the door and he saw me. He doubled back and he looked in at and he walked away and called me a "snitch" and "MF."

BY MR. WONG: Objection, your Honor, irrelevant.

\* \* \* \*

BY THE COURT: Okay, I'll sustain the objection

BY MR. WONG: We ask the jury be admonished.

\* \* \* \*

BY THE COURT: It was non-responsive to the question.

\* \* \* \*

BY THE COURT: Ladies and gentleman, you shall disregard the statement regarding the witness being threatened.

¶169. Dycus argues that allowing the jury to hear that he allegedly threatened Davis and called him names was prejudicial to his case. Yet his counsel properly and quickly objected to this testimony. The trial judge then sustained the objection and admonished the jury to disregard the witnesses' non-responsive statement.

¶170. "It is well settled that when the trial judge sustains an objection to testimony and he directs the jury to disregard it, prejudicial error does not result." **Estes v. State**, 533 So.2d 437, 439 (Miss. 1988). Additionally, "[i]t is presumed that when a trial judge sustains an objection the jury understands that the trial court disapproves of the testimony." **Id.** at 439. Here the trial court judge acted exactly as he should have when faced with an unresponsive witness. There is no error.

**24. Is Kelvin Dycus entitled to a new trial because of errors in the record?**

¶171. Dycus argues that he is entitled to a new trial because the record is incomplete. He offers that several bench conferences are unrecorded and that the jury questionnaires are missing.

¶172. A close review of the record reveals that the jury questionnaires are indeed included in the record. There are also almost a dozen bench conferences provided in the record—from critical legal battles between counsel to lighter moments, as when the judge warned the prosecution that several members of the jury were

43

becoming bored during technical testimony, and conferences about lunch time and rest room breaks. Some bench conferences span several pages of the record at a time. There are also several recorded and duly transcribed recordings of conferences in the judge's chambers. There are no errors or omissions in the record that would warrant a new trial, and this assignment of error is without merit.

## 25. Are all the assigned errors, taken together, cause for reversal?

¶173. None of the errors Dycus has identified have any merit. There is no cumulative error warranting reversal.

## Proportionality of the Death Penalty

¶174. After the death penalty has been imposed by a jury and submitted to us on appeal, we consider its worth under four guidelines established by the Legislature. We must determine:

> Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor . . . Whether the evidence supports the jury's . . .finding of a statutory aggravating circumstance . . . [and] Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and . . . Should one or more of the aggravating circumstances be found invalid on appeal, [we] shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105. We have carefully weighed and examined these guidelines in the pages above, and after reviewing the entire record in this appeal as well as the death penalty cases listed in the appendix, we conclude that the sentence of death imposed upon Kelvin Dycus was not imposed under the influence of passion, prejudice, or any other factor. We also find that the evidence is more than sufficient to support the jury's finding of statutory aggravating circumstances; namely, that the murder of Mrs. Pittman heinous, atrocious, and cruel. Additionally, the sentence is not excessive or disproportionate to factually similar cases, despite the age of Dycus when the crime was committed. Lastly, the mitigating circumstances

44

of Dycus' childhood did not outweigh the aggravating circumstances of the crime, and the jury did not consider any invalid aggravating circumstances. We affirm the sentence of death for Kelvin Dycus.

## CONCLUSION

¶175.    Mrs. Pittman was seventy-six years old when she was murdered by Kelvin and Jason Dycus.   A jury composed of men and women of Bolivar County found Dycus guilty and determined that he would pay the ultimate price.

¶176.    We find no error in the decision of the jury or in the actions of the trial judge who oversaw the trial. For the reasons discussed  above, we affirm the judgment  of the trial court.

¶177.    **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT II: CONVICTION OF UNLAWFUL THEFT OF AN AUTOMOBILE AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**


**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND DICKINSON, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Howell v. State,* --- So.2d --- (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State,* 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999).

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).

*remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999).

*remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

## DEATH CASES AFFIRMED BY THIS COURT
### (continued)

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

## DEATH CASES AFFIRMED BY THIS COURT

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988),*Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987)*, **Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

**Gray v. State**, 472 So. 2d 409 (Miss. 1985).

**Cabello v. State**, 471 So. 2d 332 (Miss. 1985).

**Jordan v. State**, 464 So. 2d 475 (Miss. 1985).

**Wilcher v. State**, 455 So. 2d 727 (Miss. 1984).

**Billiot v. State**, 454 So. 2d 445 (Miss. 1984).

**Stringer v. State**, 454 So. 2d 468 (Miss. 1984).

**Dufour v. State**, 453 So. 2d 337 (Miss. 1984).

**Neal v. State**, 451 So. 2d 743 (Miss. 1984).

**Booker v. State**, 449 So. 2d 209 (Miss. 1984).

**Wilcher v. State**, 448 So. 2d 927 (Miss. 1984).

**Caldwell v. State**, 443 So. 2d 806 (Miss. 1983).

**Irving v. State**, 441 So. 2d 846 (Miss. 1983).

**Tokman v. State**, 435 So. 2d 664 (Miss. 1983).

**Leatherwood v. State**, 435 So. 2d 645 (Miss. 1983).

**Hill v. State**, 432 So. 2d 427 (Miss. 1983).

**Pruett v. State**, 431 So. 2d 1101 (Miss. 1983).

**Gilliard v. State**, 428 So. 2d 576 (Miss. 1983).

**Evans v. State**, 422 So. 2d 737 (Miss. 1982).

**King v. State**, 421 So. 2d 1009 (Miss. 1982).

## DEATH CASES AFFIRMED BY THIS COURT
### (continued)

**Wheat v. State**, 420 So. 2d 229 (Miss. 1982).

iv

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

  * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

## DEATH CASES REVERSED AS TO GUILT PHASE

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## <u>FOR RESENTENCING TO LIFE IMPRISONMENT</u>

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

   *\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

   *\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

   *\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

   *\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

# DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## ON SENTENCING PHASE ONLY
### (continued)

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  *  Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.